## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| PETER KOBOR, *individually and on behalf of all others similarly situated*,<br><br>        Plaintiff,<br><br>v.<br><br>SKIDMORE COLLEGE,<br><br>        Defendant. | Case No. 1:23-cv-1392 (MAD/DJS)<br><br><br>**CONSOLIDATED CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |
| MARY COGAN, *individually and on behalf of all others similarly situated*,<br><br>        Plaintiff,<br><br>v.<br><br>SKIDMORE COLLEGE,<br><br>        Defendant. | Case No. 1:23-cv-1409 (MAD/DJS) |

Plaintiffs Peter Kobor and Mary Cogan ("Plaintiffs"), individually and on behalf of all others similarly situated (the "Class" or "Class Members"), bring this Consolidated Class Action Complaint against Defendant Skidmore College ("Defendant"). The allegations in this Complaint are based on the personal knowledge of the Plaintiffs and upon information and belief and further investigation of counsel.

## <u>NATURE OF THE ACTION</u>

1.        This is a data breach class action against Defendant for its failure to adequately secure and safeguard Personally Identifiable Information ("PII").

1

2.      On or about February 15, 2023, an unauthorized actor intentionally targeted and gained access to the Defendant's network, deployed ransomware, and obtained unauthorized access to Defendant's files (the "Data Breach").[1]

3.      Upon information and belief, approximately 12,143 individuals' PII was compromised in the Data Breach. The PII lost in the Data Breach included Social Security numbers in combination with multiple other forms of highly sensitive PII, including names, addresses, dates of birth, health insurance app/claims information, health insurance policy and subscriber numbers, and credit/debit card numbers.[2]

4.      After learning of the Data Breach, Defendant conducted an investigation and engaged outside cybersecurity professionals and data privacy counsel. Defendant, so far, has yet to inform affected individuals when it completed its investigation or when it completely learned of the extent of the Data Breach.

5.      Upon information and belief, Defendant discovered the Data Breach on or about February 17, 2023.[3]

6.      On or about September 15, 2023, Defendant began the process of notifying affected individuals that their PII was compromised in the Data Breach.[4]

7.      Defendant had numerous statutory, regulatory, contractual, and common law duties and obligations, including those based on its affirmative representations to Plaintiffs and the Class, to keep their PII confidential, safe, secure, and protected from unauthorized disclosure or access.

---

[1] https://apps.web.maine.gov/online/aeviewer/ME/40/2b0ad8b2-8a7c-444e-836d-50025fd4dbb0.shtml (last viewed January 22, 2024).

[2] *Id.*

[3] *Id.*

[4] *Id.*

8.      Plaintiffs and the Class have taken reasonable steps to maintain the confidentiality and security of their PII.

9.      Plaintiffs and the Class reasonably expected Defendant to keep their PII confidential and securely maintained, to use this information for business purposes only, and to make only authorized disclosures of this information.

10.     Defendant, however, breached its numerous duties and obligations by failing to implement and maintain reasonable safeguards; failing to comply with industry-standard data security practices and federal and state laws and regulations governing data security; failing to properly train its employees on data security measures and protocols; failing to timely recognize and detect unauthorized third parties accessing its system and that substantial amounts of data had been compromised; and failing to timely notify the impacted Class.

11.     In this day and age of regular and consistent data security attacks and data breaches, in particular with higher education institutions, and given the sensitivity of the data entrusted to Defendant, this Data Breach is particularly egregious and foreseeable.

12.     By implementing and maintaining reasonable safeguards and complying with standard data security practices, Defendant could have prevented this Data Breach.

13.     Plaintiffs and the Class are now faced with a present and imminent lifetime risk of identity theft. These risks are made all the more substantial and significant because of the inclusion of Social Security numbers and other static PII.

14.     PII has great value to cyber criminals, especially Social Security numbers.  As a direct cause of Defendant's Data Breach, Plaintiffs' and Class Members' PII is in the hands of cyber-criminals and may be available for sale on the dark web for other criminals to access and abuse at the expense of Plaintiffs and the Class. Considering Plaintiffs' and Class Members' PII

was compromised as a result of a targeted cybercriminal attack and contained highly sensitive information, such as Social Security numbers, Plaintiffs and the Class face a current and lifetime risk of imminent identity theft or fraud as a direct result of the Data Breach.

15.     Defendant acknowledges the imminent threat the Data Breach has caused to Plaintiffs and the Class and admits that it is in the process of "reviewing and enhancing our existing policies and procedures related to data privacy to reduce the likelihood of a similar future event."[5]

16.     The modern cyber-criminal can use the PII and information stolen in cyber-attacks to assume a victim's identity when carrying out various crimes such as:

    a.  Using a victim's credit history;

    b.  Making financial transactions on their behalf and without their knowledge, including opening credit accounts in their name or taking out loans;

    c.  Impersonating them in written communications, including mail, e-mail, and/or text messaging;

    d.  Stealing and using benefits that belong to the victim; and

    e.  Committing illegal acts while impersonating them which, in turn, incriminates the victim.

17.     Plaintiffs' and the Class's PII was compromised due to Defendant's negligent and/or careless acts and omissions and the failure to protect Plaintiffs' and the Class's PII. Defendant not only failed to prevent the Data Breach, but also after discovering the Data Breach in February of 2023, waited until September 15, 2023 to begin notifying state Attorney Generals and affected individuals such as Plaintiff and members of the Class.

---

[5] *See* n 1.

18.     As a result of Defendant's delayed response to the data breach, Plaintiffs and Class Members had no idea their PII had been compromised, and that they were, and continue to be, at significant and imminent risk of identity theft and various other forms of personal, social, and financial harm. The risk will remain for their respective lifetimes because of Defendant's negligence.

19.     Plaintiffs bring this action on behalf of all persons whose PII was compromised because Defendant failed to:

   (i)     adequately protect PII entrusted to it,

   (ii)    warn its current and former students, and current and former employees of their inadequate information security practices, and

   (iii)   effectively monitor their websites and platforms for security vulnerabilities and incidents.

20.     Defendant's conduct amounts to negligence and violates federal and state statutes and guidelines.

21.     As a result of the Data Breach, Plaintiffs and Class Members suffered ascertainable losses, including but not limited to, a loss of privacy. These injuries include:

   (i)     the invasion of privacy;

   (ii)    the imminent, increased, and material risk of future identity theft and fraud;

   (iii)   the compromise, disclosure, theft, and imminent unauthorized use of Plaintiffs' and the Class's PII as a result of a targeted cyber-attack;

   (iv)    emotional distress, fear, anxiety, nuisance and annoyance related to the theft and compromise of their PII;

   (v)     lost or diminished inherent value of PII;

(vi)    out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their PII;

(vii)    lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach, including but not limited to lost time; and

(viii)    the imminent and increased risk to their PII, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII of Plaintiffs and the Class.

22.    Plaintiffs seek to remedy these harms and prevent any future data compromise on behalf of themselves and all similarly situated persons whose PII was compromised and stolen as a result of the Data Breach and remains at risk due to inadequate data security.

23.    Accordingly, Plaintiffs, on behalf of themselves and the Class, assert claims for negligence, negligence *per se*, breach of implied contract, unjust enrichment, and violations of Section 349 of the New York General Business Law. Plaintiffs also seek injunctive relief, declaratory relief, monetary damages, and all other relief as authorized in equity or by law.

## PARTIES

24.    Plaintiff **Peter Kobor** was and currently is a citizen of New York. At all relevant times and currently, he resides in Schuylerville, New York. Plaintiff Kobor received Defendant's September 15, 2023 Notice of Data Breach letter. It was sent to him by Defendant nearly seven months after the Data Breach was detected in February 2023.

25.    The Notice of Data Breach advised Mr. Kobor that the PII that could have been accessed included Mr. Kobor's name, address, Social Security Number, health insurance/app

claims information, and his credit/debit card number.[6] Prior to this Data Breach, Plaintiff Kobor took steps to protect against keeping his PII safe and monitored his PII closely. He has not knowingly transmitted his PII over unsecured or unencrypted internet connections.

26.    Plaintiff **Mary Cogan** was and currently is a citizen of New York. At all relevant times and currently, she resides in Saratoga Springs, New York. Plaintiff Cogan received Defendant's September 15, 2023 Notice of Data Breach letter. It was sent to her more than seven months after the Data Breach was detected in February 2023.

27.    The Notice of Data Breach advised that the PII that could have been accessed included Ms. Cogan's name, address, Social Security number, date of birth, credit/debit card number, health insurance application/claims information, and health insurance policy number/subscriber number.[7] Prior to the Data Breach, Plaintiff Cogan took steps to protect against keeping her PII safe and monitored her PII closely. She has not knowingly transmitted her PII over unsecured and unencrypted internet connections.

28.    Plaintiffs have suffered actual damages and are at imminent, impending, and substantial risk for identity theft and future economic harm due to the highly sensitive nature of the information that was targeted and stolen in the Data Breach. Since learning about the breach, in an effort to mitigate the risk, Plaintiffs have spent time and effort reviewing financial statements and identity theft protection reports to detect and prevent identity theft. Plaintiffs have suffered and continue to suffer emotional anguish and distress, including but not limited to fear and anxiety related to the theft and compromise of their PII.  Plaintiffs will continue to spend additional time and incur future economic costs associated with the detection and prevention of identity theft.

---

[6] *See* Exhibit 1.

[7] *See* Exhibit 2.

29.     Defendant Skidmore College is a private liberal arts college located at 815 North Broadway, Saratoga Springs, NY 12866.[8]

30.     Defendant is a four-year private, nonsectarian, coeducational school that has approximately 2,700 undergraduate students and provides 44 majors, 19 athletic varsity teams, and more than 100 student organizations.[9]

31.     Defendant collects and requires its students, applicants, and/or employees to provide PII while operating as a higher educational institution.

32.     By obtaining, collecting, using, and deriving a benefit from Plaintiffs' and Class Member's PII, Defendant assumed legal and equitable duties to those persons, and knew or should have known that it was responsible for protecting Plaintiffs' and the Class's PII from unauthorized disclosure and/or criminal hacking activity.

## JURISDICTION AND VENUE

33.     This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d), *et seq*. The amount in controversy exceeds $5 million, exclusive of interest and costs. There are more than 100 members in the proposed class, and at least one member of the class is a citizen of a state different from Defendant. Thus, minimal diversity exists under 28 U.S.C. § 1332(d)(2)(A).

34.     This Court has personal jurisdiction over Defendant because Defendant's principal places of business is located within this District and the Defendant conducts substantial business in this District.

---

[8] *See* n 1.

[9] https://www.skidmore.edu/about/

35.     Venue is proper in this Court under 28 U.S.C. § 1391, because a substantial part of the events or omissions giving rise to these claims occurred in, were directed to, and/or emanated from this District, and Defendant resides within this judicial district.

## FACTUAL ALLEGATIONS

**Background**

36.     Defendant is a four-year private, nonsectarian, coeducational college with approximately 2,700 undergraduate students.[10] Defendant is also one of the largest employers in the Saratoga Springs region with "some of the longest tenured staff and faculty".[11]

37.     In the ordinary course of its business practices, Defendant stores, maintains, and uses Plaintiffs' and Class Members' PII including but not limited to: full names, social security numbers; addresses; dates of birth; credit/debit card information; health insurance application/claims information; and health insurance policy numbers/subscriber numbers.

38.     Defendant understands the importance of securely maintaining PII.

39.     Defendant's privacy policy, which was updated on October 4, 2023, explains that "Skidmore will not share your [PII] with third parties…."[12] Further, Defendant falsely claims it "is firmly committed to data security."[13]

**The Data Breach**

40.     Defendant became aware of the Data Breach on or about February 17, 2023.

---

[10] https://www.skidmore.edu/about/

[11] *Id.*

[12] https://www.skidmore.edu/privacy-statement/index.php#:~:text=Skidmore%20will%20not%20share%20your,under%20%22Sharing%20Your%20Information.%22&text=If%20you%20use%20any%20comment,to%20send%20you%20unsolicited%20messages.

[13] *Id.*

41.     Defendant then took steps to secure its systems and retain independent cybersecurity experts to investigate the matter further but did not notify affected individuals until on or around September 15, 2023.

42.     In disclosures to the Maine Attorney General, Defendant stated that the Data Breach was discovered on February 17, 2023.[14] Defendant waited almost seven months after learning of the Data Breach before notifying all affected individuals.

43.     Defendant further informed Plaintiffs and other Class Members that "an unauthorized actor gained access to the Skidmore's network before deploying ransomware", which encrypted Skidmore's systems.[15] This was clearly a targeted cyberattack intended to steal Plaintiffs' and Class Members' PII as there is no other reason an "unauthorized actor" would infiltrate Defendant's network and deploy ransomware.

44.     The PII compromised in the Data Breach included highly confidential information likely to subject Plaintiffs and Class Members to a perpetual risk of identity theft and fraud now that it has been exposed. The PII compromised includes, names, addresses, Social Security numbers, dates of birth, credit/debit card numbers, health insurance application/claims information, and health insurance policy number/subscriber numbers.[16]

45.     Additionally, though Plaintiffs and Class Members have an interest in ensuring that their information remains protected, the details of the root cause of the Data Breach, the vulnerabilities exploited, and the remedial measures taken to ensure a breach does not occur again have not been shared with regulators or the Class.

---

[14] *See* n 1.

[15] *Id.*

[16] *Id.*

46.    As a result of Defendant's failure to use reasonable security procedures and practices appropriate to the nature of the sensitive, unencrypted information it was maintaining for Plaintiffs and Class Members, Defendant caused the exposure of PII for more than 12,000 individuals.

**Defendant Was Aware of the Data Breach Risks**

47.    Defendant had obligations created by contract, industry standards, common law, and representations made to Plaintiffs and Class, to keep their PII confidential and to protect it from unauthorized access and disclosure.

48.    Plaintiffs and Class Members provided their PII to Defendant with the reasonable expectation and mutual understanding that Defendant would comply with their obligations to employ reasonable care to keep such information confidential and secure from unauthorized access.

49.    Defendant's data security obligations were particularly important given the substantial increase in cyber-attacks and data breaches in higher education institutions preceding the date of the Data Breach.

50.    Indeed, data breaches, such as the one experienced by Defendant, have become so notorious that the Federal Bureau of Investigation ("FBI") and U.S. Secret Service have issued a warning to potential targets so they are aware of, and prepared for, a potential attack.  Therefore, the increase in such attacks, and attendant risk of future attacks, was widely known and foreseeable to the public and to anyone in Defendant's industry, including Defendant.

51.    According to the Federal Trade Commission ("FTC"), identity theft wreaks havoc on consumers' finances, credit history, and reputation and can take substantial time, money, and

patience to resolve.[17] Identity thieves use the stolen PII for a variety of crimes, including but not limited to, credit card fraud, telephone or utilities fraud, and bank and finance fraud.[18]

52.    The PII of Plaintiffs and the Class were taken by cyber criminals in a targeted cyber-attack for the very purpose of stealing Plaintiffs' and Class Members' PII, engaging in identity theft, fraud, or to sell it to other criminals who will purchase the PII for that purpose. The fraudulent activity resulting from the Data Breach may not come to light for years.

53.    Defendant knew, or should have known, the importance of safeguarding the PII of Plaintiffs and the Class, including Social Security numbers, and of the foreseeable consequences that would occur if Defendant's data security systems were breached, including, specifically, the significant costs that would be imposed on Plaintiffs and the Class as a result of a breach.

54.    Plaintiffs and the Class now face years of constant monitoring and surveillance of their financial and personal records. The Class is incurring and will continue to incur such damages in addition to any fraudulent use of their PII as a direct result of the Data Breach.

55.    The injuries to Plaintiffs and Class were directly and proximately caused by Defendant's own failure to implement or maintain adequate data security measures and best practices for safeguarding the PII of Plaintiffs and the Class.

56.    Further, in May of 2023, Higher Ed Dive published an online article titled, "Ransomware threat against colleges grows, survey finds" that, among other things, warned that

---

[17] *See Taking Charge, What to Do If Your Identity is Stolen*, FTC, 3 (Apr. 2013), https://www.myoccu.org/sites/default/files/pdf/taking-charge-1.pdf (last visited Jan. 22, 2024).

[18] *Id*. The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority." 16 CFR § 603.2. The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, social security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number." *Id*.

"ransomware attacks targeted the education sector more than any other industry in the last year, with 79% of surveyed higher education institutions across the world reporting being hit…."[19] Additionally, in July of 2022, Inside Higher Ed published an online article titled, "Ransomware Attacks Against Higher Ed Increase", which stated, "[c]olleges and universities worldwide experienced a surge in ransomware attacks in 2021, and those attacks had significant operational and financial costs, according to a new report from Sophos, a global cybersecurity leader."[20]

57.    In April 2020, ZDNet reported, in an article titled "Ransomware mentioned in 1,000+ SEC filings over the past year," that "[r]ansomware gangs are now ferociously aggressive in their pursuit of big companies. They breach networks, use specialized tools to maximize damage, leak corporate information on dark web portals, and even tip journalists to generate negative news for companies as revenge against those who refuse to pay."[21]

58.    In September 2020, the United States Cybersecurity and Infrastructure Security Agency published online a "Ransomware Guide" advising that "[m]alicious actors have adjusted their ransomware tactics over time to include pressuring victims for payment by threatening to release stolen data if they refuse to pay and publicly naming and shaming victims as secondary forms of extortion."[22]

---

[19] Higher Ed Dive, Ransomware threat against colleges grows, survey finds (May 10, 2023) (emphasis added), available at https://www.highereddive.com/news/ransomware-threat-colleges-grows-sophos/649976/ (last visited: January 18, 2024).

[20] Inside Higher Ed, Ransomware Attacks Against Higher Ed Increase (July 21, 2022) (emphasis added), available at https://www.insidehighered.com/news/2022/07/22/ransomware-attacks-against-higher-ed-increase (last visited: January 18, 2024).

[21] 5 ZDNet, Ransomware mentioned in 1,000+ SEC filings over the past year (Apr. 30, 2020) (emphasis added), available at https://www.zdnet.com/article/ransomware-mentioned-in-1000-sec-filings-over-the-past-year/ (last visited December 7, 2023).

[22] U.S. CISA, Ransomware Guide – September 2020, available at https://www.cisa.gov/sites/default/files/publications/CISA_MS-ISAC_Ransomware%20Guide_S508C.pdf (last visited December 7, 2023).

59.     This readily available and accessible information confirms that, prior to the Data Breach, Defendant knew or should have known that (i) cybercriminals were targeting the education sector, such as Defendant, (ii) cybercriminals were ferociously aggressive in their pursuit of organizations and universities in possession of significant sensitive information such as Defendant, (iii) cybercriminals were leaking sensitive information on dark web portals, and (iv) cybercriminals' tactics included threatening to release stolen data.

60.     Considering the information was readily available and accessible on the internet before the Data Breach and Defendant's involvement in the data breach litigation, Defendant, having elected to store the unencrypted PII of Plaintiff and Class Members, had reason to know that Plaintiffs' and Class Members' PII was at risk for being shared with unknown and unauthorized persons.

61.     Prior to the Data Breach, Defendant knew or should have known that there was a foreseeable risk that Plaintiffs' and Class Members' PII could be accessed, exfiltrated, and published as a result of a cyberattack.

62.     Prior to the Data Breach, Defendant knew or should have known that it should have confirmed the information it obtained was encrypted to protect against their publication and misuse in the event of a cyberattack.

63.     Since the Data Breach, Defendant continues to store applicant, student, and employee information, including Plaintiffs' and Class Members' PII, and has failed to give adequate assurances that it has enhanced its security practices sufficiently to avoid another breach.

**Defendant Failed to Comply with FTC Guidelines**

64.     The FTC has promulgated numerous guides for businesses which highlight the importance of implementing reasonable and adequate data security practices. According to the FTC, the need for data security should be factored into all business decision-making.

65.     In 2022, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established cyber-security guidelines for businesses. The guidelines note that businesses should protect the personal customer information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their networks' vulnerabilities; and implement policies to correct any security problems. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[23]

66.     The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

67.     The FTC has brought enforcement actions against businesses for failing to protect consumer data adequately and reasonably, treating the failure to employ reasonable and

---

[23] Ritchie, J. N. & A., & Jayanti, S.F.-T. and A. (2022, April 26). *Protecting personal information: A guide for business.* Federal Trade Commission. https://www.ftc.gov/business-guidance/resources/protecting-personal-information-guide-business (last accessed January 22, 2024)

appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

68.     Defendant failed to properly implement basic data security practices, and its failure to employ reasonable and appropriate measures to protect against unauthorized access to consumer PII constitutes an unfair act or practice prohibited by Section 5 of the FTCA, 15 U.S.C. § 45.

69.     To prevent and detect cyber-attacks, including the cyber-attack on Defendant's network that resulted in the Data Breach, Defendant could and should have implemented, as recommended by the United States Government and FTC, the following measures:

a.  Implement an awareness and training program. Employees and individuals should be aware of the threat of malware and how it is delivered because end users are targets of data breaches;

b.  Enable strong spam filters to prevent phishing emails from reaching the end users and authenticate inbound email using technologies like Sender Policy Framework (SPF), Domain Message Authentication Reporting and Conformance (DMARC), and DomainKeys Identified Mail (DKIM) to prevent email spoofing;

c.  Scan all incoming and outgoing emails to detect threats and filter executable files from reaching end users;

d.  Configure firewalls to block access to known malicious IP addresses;

e.  Patch operating systems, software, and firmware on devices. Consider using a centralized patch management system;

f.  Set anti-virus and anti-malware programs to conduct regular scans automatically;

g.  Manage the use of privileged accounts based on the principle of least privilege: no users should be assigned administrative access unless absolutely needed; and those with a need for administrator accounts should only use them when necessary;

h.  Configure access controls—including file, directory, and network share permissions—with least privilege in mind. If a user only needs to read specific files, the user should not have write access to those files, directories, or shares;

i.  Disable macro scripts from office files transmitted via email. Consider using Office Viewer software to open Microsoft Office files transmitted via email instead of full office suite applications;

j.  Implement Software Restriction Policies (SRP) or other controls to prevent programs from executing from common malware locations, such as temporary folders supporting popular Internet browsers or compression/decompression programs, including the AppData/LocalAppData folder;

k.  Consider disabling Remote Desktop protocol (RDP) if it is not being used;

l.  Use application whitelisting, which only allows systems to execute programs known and permitted by security policy;

m.  Execute operating system environments or specific programs in a virtualized environment; and

n.  Categorize data based on organizational value and implement physical and logical separation of networks and data for different organizational units.

70.  Defendant was at all times fully aware of its obligation to protect the PII of its applicants, students, and employees. Defendant was also aware of the significant repercussions that would result from its failure to do so.

**Defendant Failed to Comply with Industry Standards**

71.     A number of industry and national best practices have been published and should have been used as a go-to resource and authoritative guide when developing Defendant's cybersecurity practices.  Best cybersecurity practices that are standard in higher education include installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches and routers; monitoring and protection of physical security systems; protection against any possible communication system; and training staff regarding critical points.

72.     Upon information and belief, Defendant failed to meet the minimum standards of the following cybersecurity frameworks: the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are established standards in reasonable cybersecurity readiness.  These frameworks are existing and applicable industry standards in Defendant's industry, and Defendant failed to comply with these accepted standards, thereby opening the door to the cyber-attack and causing the Data Breach.

73.     The occurrence of the Data Breach indicates that Defendant failed to adequately implement one or more of the above measures to prevent ransomware attacks, resulting in the Data Breach.

**PII Holds Value to Cyber Criminals**

74.     Higher education institutions, such as Defendant, that store PII are likely to be targeted by cyber criminals. Credit card, routing, and bank account numbers are highly sought data

targets for hackers, but information such as Social Security numbers are even more attractive to cyber criminals; they are not easily destroyed or replaceable and can be easily used to perpetrate acts of identity theft and other types of fraud.

75.    The PII of individuals remains of high value to criminals, as evidenced by the prices they will pay through the dark web to obtain PII of other unknown individuals. Numerous sources cite dark web pricing for stolen identity credentials. For example, PII can be sold at prices ranging from $40 to $200, and banking details have a price range of $50 to $200.[24]

76.    Social Security numbers, for example, are among the worst kind of PII to have stolen or otherwise compromised because they may be put to a variety of fraudulent uses and are difficult for an individual to change or otherwise repair once it's compromised. The Social Security Administration ("SSA") stresses that the loss of an individual's Social Security number, as is the case here, can lead to identity theft and extensive financial fraud:

> A dishonest person who has your Social Security number can use it to get other personal information about you. Identity thieves can use your number and your good credit to apply for more credit in your name. Then, they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought. Someone illegally using your Social Security number and assuming your identity can cause a lot of problems.[25]

77.    What is more, it is no easy task to change or cancel a stolen or compromised Social Security number as is the case for Plaintiffs and Class Members in this action. An individual cannot obtain a new Social Security number without significant time, monetary investment, paperwork

---

[24] *Your personal data is for sale on the dark web. Here's how much it costs,* Digital Trends, (Oct. 16, 2019), https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs (last visited Jan. 22, 2024).

[25] *Identity Theft and Your Social Security Number*, https://www.ssa.gov/pubs/EN-05-10064.pdf (last accessed Jan. 22, 2024).

and evidence of actual misuse. In other words, preventive action to defend against the possibility of misuse of a Social Security number is not permitted and the only forms of remediation happen *after* the first incident of misuse; an individual must show evidence of actual, ongoing fraudulent activity to be eligible to submit an application requesting a new Social Security number with the SSA.

78.     Furthermore, as the SSA warns:

Keep in mind that a new number probably will not solve all your problems. This is because other governmental agencies (such as the IRS and state motor vehicle agencies) and private businesses (such as banks and credit reporting companies) likely will have records under your old number. Along with other personal information, credit reporting companies use the number to identify your credit record. So using a new number will not guarantee you a fresh start. This is especially true if your other personal information, such as your name and address, remains the same.

If you receive a new Social Security Number, you should not be able to use the old number anymore.

For some victims of identity theft, a new number actually creates new problems. If the old credit information is not associated with your new number, the absence of any credit history under the new number may make more difficult for you to get credit.[26]

79.     Here, the unauthorized access by cyber criminals left them with the tools to perform the most thorough identity theft—they have obtained all the essential PII that can be used to mimic the identity of the victim, including Social Security numbers. The PII of Plaintiffs and the Class stolen in the Data Breach constitutes a dream for hackers or cyber criminals and a nightmare for Plaintiffs and the Class. The PII stolen from Plaintiffs and Class Members is essentially one-stop shopping for identity thieves indefinitely.

---

[26] *Id.*

80.    The FTC has released its updated publication on protecting PII for businesses, which includes instructions on protecting PII, properly disposing of PII, understanding network vulnerabilities, implementing policies to correct security problems, using intrusion detection programs, monitoring data traffic, and having in place a response plan.

81.    General policy reasons support such an approach. A person whose personal information has been compromised may not see any signs of identity theft for years. According to the United States Government Accountability Office ("GAO") Report to Congressional Requesters:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[27]

82.    Companies recognize that PII is a valuable asset and a valuable commodity, but also necessary throughout the typical course of business with consumers. A "cyber black-market" exists in which criminals openly post stolen Social Security numbers and other PII on a number of dark web Internet websites. The stolen PII from Plaintiffs and the Class has a high value on both legitimate and black markets.

83.    Identity thieves may commit various types of crimes such as immigration fraud, obtaining a driver's license or identification card in the victim's name but with another's picture, and/or using the victim's information to obtain a fraudulent tax refund or fraudulent unemployment benefits. The United States government and privacy experts acknowledge that it may take years for identity theft to come to light and be detected.

---

[27] *See* https://www.gao.gov/assets/gao-07-737.pdf (June 2007) at 29.

84.     As noted above, the disclosure of Social Security numbers in particular poses a significant risk. Criminals can, for example, use Social Security numbers to create false bank accounts or file fraudulent tax returns or other tax related forms and documents using an alias of their victim. Class Members whose Social Security numbers have been compromised in the Data Breach now face a real, present, imminent, and substantial risk of identity theft and other problems associated with the disclosure of their Social Security number and will need to monitor their credit and tax filings for an indefinite duration.

85.     Based on the foregoing, the information compromised in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach, because those victims can file disputes, cancel or close credit and debit cards and/or accounts. The information compromised in this Data Breach is impossible to "close" and difficult, if not nearly impossible, to change — Social Security number, driver's license number or government-issued identification number, name, and date of birth are durable.

86.     This data demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "Compared to credit card information, personally identifiable information and Social Security numbers are worth more than 10x on the black market."[28]

87.     Among other forms of fraud, identity thieves may obtain driver's licenses, government benefits, medical services, and housing or even give false information to police or other emergency medical services. An individual may not know that their driver's license was used

---

[28] Tim Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, IT World, (Feb. 6, 2015), https://www.networkworld.com/article/935334/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html (last visited Jan. 22, 2024).

to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud, or until the individual attempts to lawfully apply for unemployment and is denied benefits (due to the prior, fraudulent application and award of benefits).

**Plaintiffs' and Class Members' Damages**

88.    Defendant has failed to provide any compensation for the unauthorized release and disclosure of Plaintiffs' and the Class's PII other than offering 24 months of Experian IdentityWorks complimentary monitoring services to individuals involved in the Data Breach.[29]

89.    Plaintiffs and the Class have been damaged by the targeted cyber-attack resulting in the compromise of their PII in the Data Breach.

90.    As a result of the targeted cyber-attack compromising Plaintiffs' and Class Members' PII, which includes highly confidential information such as Social Security numbers, Plaintiffs and Class Members are presently at a substantial risk of future harm in the form of identity theft or fraud.

91.    Plaintiffs and the Class also presently face a substantial risk of out-of-pocket fraud losses such as loans opened in their names, tax return fraud, utility bills opened in their names, credit card fraud, and similar identity theft.

92.    Plaintiffs and the Class have been, and currently face substantial risk of being targeted now and in the future, to phishing, data intrusion, and other illegality based on their PII being compromised in the Data Breach as potential fraudsters could use the information garnered to target such schemes more effectively against Plaintiffs and the Class.

---

[29] *See* n 1.

93.     Plaintiffs and the Class may also incur out-of-pocket costs for implementing protective measures such as purchasing credit monitoring fees, credit report fees, credit freeze fees, and other similar costs directly or indirectly related to mitigating the Data Breach.

94.     Plaintiffs and the Class also suffered a loss of value of their PII when it was acquired by cyber thieves in the Data Breach. Numerous courts have recognized the propriety of loss of value damages in data breach cases.

95.     Plaintiffs and the Class have spent and will continue to spend significant amounts of time monitoring their financial accounts, credit score, and records for misuse.

96.     Plaintiffs and the Class have suffered or will suffer actual injury as a direct result of the Data Breach. Many victims suffered ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach

97.     Moreover, Plaintiffs and the Class have an interest in ensuring that their PII, which is believed to remain in the possession of Defendant, is protected from further breaches by the implementation of proper and adequate security measures and safeguards, including but not limited to, making sure that the storage of data or documents containing personal and financial information is not accessible online and that access to such data is password protected.

98.     Further, as a result of Defendant's conduct, Plaintiffs and the Class are forced to live with the anxiety that their PII —which contains the most intimate details about a person's life—may be disclosed to the entire world, whether physically or virtually, thereby subjecting them to embarrassment and depriving them of any right to privacy whatsoever.

99.     As a direct and proximate result of Defendant's actions and inactions, Plaintiffs and the Class have suffered anxiety, emotional distress, and loss of privacy, and are at an increased risk of future harm because of the Data Breach.

**Plaintiff Kobor's Experience**

100.    Plaintiff Kobor received Defendant's Notice of Data Breach letter from Defendant on or around September 15, 2023, almost seven months after the Data Breach was detected in February of 2023.

101.    The Notice advised him that the PII compromised in the Data Breach included Plaintiff Kobor's name, address, Social Security Number, credit/debit card number, and health insurance/app claims information.[30]

102.    Plaintiff Kobor entrusted his PII and other confidential information to Defendant with the reasonable expectation and understanding that Defendant or its agents, would take industry-standard precautions to protect, maintain, and safeguard that information from unauthorized users or disclosure, and would timely notify him of any data security incidents related to his PII. Plaintiff Kobor would not have allowed Defendant to collect and maintain his PII had he known that Defendant would not take reasonable steps to safeguard his PII.

103.    Plaintiff Kobor has been forced to spend time dealing with and responding to the direct consequences of the Data Breach, which include spending time on telephone calls, researching the Data Breach, exploring credit monitoring and identity theft insurance options, and self-monitoring his accounts. This is time that has been lost forever and cannot be recaptured.

---

[30] *See* Exhibit 1.

104.     Plaintiff Kobor stores all documents containing his PII in a safe and secure location. Moreover, he diligently chooses unique usernames and passwords for the online accounts that he has.

105.     Plaintiff Kobor has suffered actual injury in the form of damages to, and diminution in, the value of his PII – a form of intangible property that Plaintiff Kobor entrusted to Defendant. This PII was compromised and its value has been diminished because of the Data Breach.

106.     Plaintiff Kobor has also suffered actual injury in the forms of lost time and opportunity costs, annoyance, interference, and inconvenience as a result of mitigating the Data Breach, and has anxiety and increased concerns due to the loss of his privacy and the substantial risk of fraud and identity theft which he now faces.

107.     As a result of the Data Breach, Plaintiff Kobor experienced direct instances of attempted fraud.

108.     As a result of the Data Breach, Plaintiff Kobor and his wife received mail stating that they had incompletely filled out a credit card application and needed to provide additional information. Neither Plaintiff Kobor nor his wife had ever filled out this credit card application and believe this was an attempt to obtain more of their Private Information. Prior to the Data Breach, Plaintiff Kobor had never experienced this type of instance of fraud.

109.     As a result of the Data Breach, Plaintiff Kobor received fraudulent PIN number rests to his Microsoft Outlook account. Specifically, based on the fraudulent PIN number receipts, Plaintiff Kobor believes he experienced a cybercriminal attempting to gain access to his Microsoft Outlook account, which contains Private Information as well as his credit card number. Prior to the Data Breach, Plaintiff Kobor had never experienced this type of instance of fraud.

110.    Plaintiff Kobor has suffered actual damages and is at an imminent, impending, and substantial risk for identity theft and future economic harm due to the highly sensitive nature of the information that was targeted and stolen in the Data Breach, especially his Social Security number, in combination with his name.

111.    Knowing that thieves stole his PII in a targeted cyber-attack and knowing that his PII will likely be sold on the dark web has caused Plaintiff Kobor great anxiety.

112.    Additionally, Plaintiff Kobor does not recall having been involved in any other data breaches in which his highly confidential PII, such as Social Security Number, was compromised.

113.    Plaintiff Kobor has a continuing interest in ensuring that his PII which, upon information and belief, remains in the possession of Defendant, is protected and safeguarded from future data breaches.

114.    As a result of the Data Breach, Plaintiff Kobor is presently and will continue to be at a present and heightened risk for financial fraud, identity theft, and other forms of fraud for years to come.

**Plaintiff Cogan's Experience**

115.    Plaintiff Cogan received Defendant's Notice of Data Breach letter from Defendant on September 23, 2023, over seven months after the Data Breach was detected in February of 2023.

116.    Plaintiff Cogan is a former student and employee of Defendant Skidmore College.

117.    The Notice advised her that the PII compromised in the Data Breach included Plaintiff Cogan's name, address, Social Security Number, date of birth, credit/debit card number,

health insurance/app claims information, and her health insurance policy number/subscriber number.[31]

118.    The Notice further advised that Defendant was in the process of implementing "additional security protocols designed to protect [Defendant's]network, email, environment, and systems."[32]

119.    Prior to this Data Breach, Plaintiff Cogan had taken steps to keep her PII safe and has monitored her PII closely. She has not knowingly transmitted her PII over unsecured or unencrypted internet connections.

120.    Plaintiff Cogan has suffered actual damages and is at an imminent, impending, and substantial risk for identity theft and future economic harm due to the highly sensitive nature of the information that was targeted and stolen in the Data Breach. Since learning about the breach, in an effort to mitigate the risk, Plaintiff has spent time and effort reviewing financial statements and identity theft protection reports to detect and prevent identity theft. Plaintiff has suffered and continues to suffer emotional anguish and distress, including but not limited to fear and anxiety related to the theft and compromise of her PII.  Plaintiff Cogan will continue to spend additional time and incur future economic costs associated with the detection and prevention of identity theft.

121.    Plaintiff Cogan entrusted her PII and other confidential information to Defendant with the reasonable expectation and understanding that Defendant or its agents, would take industry-standard precautions to protect, maintain, and safeguard that information from unauthorized users or disclosure, and would timely notify her of any data security incidents related

---

[31] *See* Exhibit 2.

[32] *Id.*

to her PII. Plaintiff Cogan would not have allowed Defendant to collect and maintain her PII had she known that Defendant would not take reasonable steps to safeguard her PII.

122.    Plaintiff Cogan has been forced to spend time dealing with and responding to the direct consequences of the Data Breach, which include spending time on the telephone calls, researching the Data Breach, exploring credit monitoring and identity theft insurance options, and self-monitoring her accounts. This is time that has been lost forever and cannot be recaptured.

123.    Plaintiff Cogan stores all documents containing her PII in a safe and secure location. Moreover, she diligently chooses unique usernames and passwords for the online accounts that she has.

124.    Plaintiff Cogan has suffered actual injury in the form of damages to, and diminution in, the value of her PII – a form of intangible property that Plaintiff Cogan entrusted to Defendant. This PII was compromised, and its value has been diminished as a result of the Data Breach.

125.    Plaintiff Cogan has also suffered actual injury in the forms of lost time and opportunity costs, annoyance, interference, and inconvenience as a result of the Data Breach, and has anxiety and increased concerns due to the loss of her privacy and the substantial risk of fraud and identity theft which she now faces.

126.    Plaintiff Cogan has suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse of her PII resulting from the compromise of her PII in the targeted Data Breach, especially her Social Security number in combination with her name, address, and date of birth.

127.    Additionally, Plaintiff Cogan does not recall having been involved in any other data breaches in which her highly confidential PII, such as Social Security Number was compromised.

128. Plaintiff Cogan has a continuing interest in ensuring that her PII which, upon information and belief, remains in the possession of Defendant, is protected and safeguarded from future data breaches.

129. As a result of the Data Breach, Plaintiff Cogan is presently and will continue to be at a present and heightened risk for financial fraud, identity theft, other forms of fraud, and the attendant damages, for years to come.

## CLASS ALLEGATIONS

130. Plaintiffs bring this class action on behalf of a Nationwide Class and New York Subclass according to Federal Rules of Civil Procedure, Rules 23(b)(2), 23(b)(3), and 23(c)(4).

131. The Nationwide Class that Plaintiffs seek to represent is defined as follows:

All persons residing in the United States whose PII was compromised during the Data Breach that is the subject of the Notice of Data Breach published by Defendant and dated September 15, 2023 (the "Class").

132. The New York Subclass that Plaintiffs seek to represent is defined as follows:

All persons residing in the state of New York whose PII was compromised during the Data Breach that is the subject of the Notice of Data Breach published by Defendant and dated September 15, 2023 (the "New York Subclass).

133. Excluded from the Class are: (i) Defendant and its employees, officers, directors, affiliates, parents, subsidiaries, and any entity in which Defendant has a whole or partial ownership of financial interest; (ii) all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; (iii) any counsel and their respective staff appearing in this matter; and (iv) all judges assigned to hear any aspect of this litigation, their immediate family members, and their respective court staff.

134.    Plaintiffs reserve the right to modify or amend the definitions of the proposed Class and New York Subclass before the Court determines whether certification is appropriate.

135.    **Numerosity**. The Class is so numerous that joinder of all members is impracticable. The Class includes thousands of individuals whose personal data was compromised by the Data Breach.  The exact number of Class Members is in the possession and control of Defendant and will be ascertainable through discovery, but Defendant has disclosed that approximately 12,143 individuals' PII was compromised in the Data Breach.

136.    **Commonality.**  There are numerous questions of law and fact common to Plaintiffs and Class Members that predominate over any questions that may affect only individual Class Members, including, without limitation:

a.    Whether Defendant unlawfully maintained, lost or disclosed Plaintiffs' Class Members' PII;

b.    Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

c.    Whether Defendant's data security systems prior to and during the Data Breach complied with applicable data security laws and regulations;

d.    Whether Defendant's data security systems prior to and during the Data Breach were consistent with industry standards;

e.    Whether Defendant owed a duty to Class Members to safeguard their PII;

f.    Whether Defendant breached duties to the Class to safeguard their PII;

g.    Whether cyber criminals obtained Class Members' PII in the Data Breach;

h.   Whether Defendant knew or should have known that its data security systems and monitoring processes were deficient;

i.   Whether Defendant owed a duty to provide Plaintiffs and Class Members timely notice of this Data Breach, and whether Defendant breached that duty;

j.   Whether Plaintiffs and Class Members suffered legally cognizable damages as a result of Defendant's misconduct;

k.   Whether Defendant's conduct was negligent;

l.   Whether Defendant's conduct violated federal law;

m.   Whether Defendant's conduct violated state law; and

n.   Whether Plaintiffs and the Class are entitled to damages, civil penalties, punitive damages, and/or injunctive relief.

137.   **Typicality**. Plaintiffs' claims are atypical of the claims of the Class in that Plaintiffs, like all proposed Class Members, had their PII compromised, breached, or otherwise stolen in the Data Breach.  Plaintiffs and the Class Members were injured through the uniform misconduct of Defendant, described throughout this Complaint, and assert the same claims for relief.

138.   **Adequacy**.  Plaintiffs and counsel will fairly and adequately protect the interests of Plaintiffs and the proposed Classes.  Plaintiffs retained counsel who are experienced in class action and complex litigation, particularly those involving the Data Breach at issue in this Consolidated Class Action Complaint. Plaintiffs have no interests that are antagonistic to, or in conflict with, the interests of other Class Members.

139.   **Superiority.** A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Class treatment of common questions of law and fact is

superior to multiple individual actions or piecemeal litigation.  Moreover, absent a class action, most Class Members would find the cost of litigating their claims prohibitively high and would therefore have no effective remedy, so that in the absence of class treatment, Defendant's violations of law inflicting substantial damages in the aggregate would go unremedied without certification of the Classes.  Plaintiffs and Class Members have been harmed by Defendant's wrongful conduct and/or action.  Litigating this action as a class action will reduce the possibility of repetitious litigation relating to Defendant's conduct and/or inaction.  Plaintiffs know of no difficulties that would be encountered in this litigation that would preclude its maintenance as a class action.

140.    Class certification is appropriate under Fed. R. Civ. P. 23(b)(1)(A), in that the prosecution of separate actions by the individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for Defendant.  In contrast, the conduct of this action as a class action conserves judicial resources and the parties' resources and protects the rights of each member of the Class.  Specifically, injunctive relief could be entered in multiple cases, but the ordered relief may vary, causing Defendant to have to choose between differing means of upgrading its data security infrastructure and choosing the court order with which to comply.  Class action status is also warranted because prosecution of separate actions by Class Members would create the risk of adjudications with respect to individual Class Members that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

141.    Class certification, therefore, is appropriate under Rule 23(a) and (b)(2) because Defendant has acted or refused to act on grounds generally applicable to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate as to the Class as a whole.

142.    Likewise, particular issues under Rule 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

    a.   Whether Defendant owed its legal duty or obligation to Plaintiffs and Class Members to exercise due care in collecting, storing, using, safeguarding, or otherwise maintaining their PII;

    b.   Whether Defendant breached its legal duty to Plaintiffs and Class Members to exercise due care in collecting, storing, using, safeguarding, or otherwise maintaining their PII;

    c.   Whether Defendant failed to comply with its own policies or procedures and applicable laws, regulations, and industry standards relating to data security;

    d.   Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach; and

    e.   Whether Plaintiffs and Class Members are entitled to actual damages, credit monitoring or other injunctive relief, and/or punitive damages as a result of Defendant's wrongful conduct.

34

## CAUSES OF ACTION

### COUNT I
### NEGLIGENCE
### (On Behalf of Plaintiffs and the Nationwide Class)

143.    Plaintiffs and the Class re-allege and incorporate all foregoing paragraphs of this Complaint as if fully set forth herein.

144.    Plaintiffs and the Class entrusted Defendant with their PII.

145.    Plaintiffs and the Class entrusted their PII to Defendant on the premise and with the understanding that Defendant would safeguard their information, use their PII for business purposes only, and not disclose their PII to unauthorized third parties.

146.    Defendant owed a duty to Plaintiffs and the Class to exercise reasonable care in obtaining, using, maintaining, and protecting their PII from unauthorized third parties.

147.    The legal duties owed by Defendant to Plaintiffs and the Class include, but are not limited to the following:

    a.    To exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the PII of Plaintiffs and the Class in Defendant's possession;

    b.    To protect PII of Plaintiffs and the Class in Defendant's possession using reasonable and adequate security procedures that are compliant with industry-standard practices; and

    c.    To implement processes and software to quickly detect a data breach and to timely act on warnings about data breaches, including promptly notifying Plaintiffs and Class of the Data Breach.

148.    Defendant's duty to use reasonable data security measures also arose under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45(a) (the "FTC Act"), which prohibits "unfair . . . practices in or affecting commerce," including, as interested and enforced by the Federal Trade Commission, the unfair practices by institutions such as Defendant of failing to use reasonable measures to protect PII.

149.    Various FTC publications and data security breach orders further form the basis of Defendant's duty. Plaintiffs and Class Members are consumers under the FTC Act. Defendant violated Section 5 of the FTC Act by failing to use reasonable measures to protect PII and by not complying with industry standards.

150.    Defendant breached its duties to Plaintiffs and the Class. Defendant knew or should have known the risks of collecting and storing PII and the importance of maintaining secure systems, especially in light of the fact that data breaches have recently been prevalent.

151.    Defendant knew or should have known that its security practices did not adequately safeguard the PII of Plaintiffs and the Class.

152.    Through Defendant's acts and omissions described in this Complaint, including Defendant's failure to provide adequate security measures and its failure to protect the PII of Plaintiffs and the Class from being foreseeably captured, accessed, exfiltrated, stolen, disclosed, and misused, Defendant unlawfully breached its duty to use reasonable care to adequately protect and secure the PII of Plaintiffs and the Class during the period it was within Defendant's possession and control.

153.    Defendant's duty to use reasonable security measures arose as a result of the special relationship that existed between Defendant and Plaintiffs and the Class. That special relationship

arose because Plaintiffs and the Class entrusted Defendant with their confidential PII, a necessary part of obtaining services from Defendant.

154.    Defendant was subject to an "independent duty," untethered to any contract between Defendant and Plaintiffs and the Class.

155.    Defendant's own conduct created a foreseeable risk of harm to an individual, including Plaintiffs and the Class.  Defendant's misconduct included, but was not limited to, their failure to take the steps and opportunities to prevent the Data Breach as set forth herein. Defendant's misconduct also included their decisions not to comply with industry standards for safekeeping of the PII of Plaintiffs and the Class, including basic encryption techniques freely available to Defendant.

156.    Defendant was in a position to protect against the harm suffered by Plaintiffs and the Class as a result of the Data Breach.

157.    Defendant had a duty to employ proper procedures to prevent the unauthorized dissemination of the PII of Plaintiffs and the Class.

158.    Defendant breached the duties it owes to Plaintiffs and the Class in several ways, including:

      a.    Failing to implement adequate security systems, protocols, and practices sufficient to protect students' and employees' PII and thereby creating a foreseeable risk of harm;

      b.    Failing to comply with the minimum industry data security standards during the period of the Data Breach;

      c.    Failing to act despite knowing or having reason to know that its systems were vulnerable to a targeted attack; and

      d.    Failing to timely and accurately disclose to students and employees that their PII had been improperly acquired or accessed and was potentially available for sale to criminals on the dark web.

159.    There is a close causal connection between Defendant's failure to implement security measures to protect the PII of Plaintiffs and the Class and the harm, or risk of imminent harm, suffered by Plaintiffs and the Class.  The PII of Plaintiffs and the Class was stolen and accessed as the proximate result of Defendant's failure to exercise reasonable care in safeguarding such PII by adopting, implementing, and maintaining appropriate security measures.

160.    Due to Defendant's misconduct, Plaintiffs and the Class are entitled to credit monitoring at a minimum. The PII taken in the Data Breach can be used for identity theft and other types of financial fraud against Plaintiffs and the Class.

161.    Some experts recommend that data breach victims obtain credit monitoring services for at least ten years following a data breach. Annual subscriptions for credit monitoring plans range from approximately $219 to $358 per year. To date, Defendant has only offered 24 months of "complimentary access to Experian IdentityWorksSM" [sic].[33]

162.    As a result of Defendant's negligence, Plaintiffs and the Class suffered injuries that include:

    i.    the lost or diminished value of PII;

    ii.    the imminent increased risk of future identity theft and fraud that will occur as a result of the Data Breach;

    iii.    out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their PII;

    iv.    lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach, including, but not limited to, time spent deleting phishing email

---

[33] *See n* 1.

messages and cancelling credit cards believed to be associated with the compromised account;

v.   the continued risk to their PII, which may remain for sale on the dark web and is in Defendant's possession and subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII in their continued possession;

vi.   future costs in terms of time, effort, and money that will be expended to prevent, monitor, detect, contest, and repair the impact of the Data Breach for the remainder of the lives of Plaintiffs and the Class, including ongoing credit monitoring.

163.   These injuries were reasonably foreseeable given the history and uptick of data security breaches of this nature within the higher education sector. The injury and harm that Plaintiffs and the Class suffered was the direct and proximate result of Defendant's negligent conduct.

## COUNT II
## NEGLIGENCE PER SE
### (On Behalf of Plaintiffs and the Nationwide Class)

164.   Plaintiffs and the Class re-allege and incorporate all foregoing paragraphs of this Complaint as if fully set forth herein.

165.   Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendant, of failing to use reasonable measures to protect PII. The FTC publications and orders described above also form part of the basis of Defendant's duty in this regard.

166.   Defendant violated Section 5 of the FTC Act by failing to use reasonable measures to protect PII and comply with applicable industry standards. Defendant's conduct was particularly unreasonable given the nature and amount of PII it obtained and stored and the foreseeable harm.

167.    Defendant's violations of Section 5 of the FTC Act constitute negligence *per se*.

168.    Plaintiffs and the Class are within the class of persons that the FTCA was intended to protect.

169.    The harm that occurred as a result of the Data Breach is the type of harm the FTCA was intended to guard against. The FTC has pursued enforcement actions against businesses, which, as a result of its failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiffs and the Class.

170.    As a direct and proximate result of Defendant's negligence *per se*, Plaintiffs and the Class have suffered and will suffer injury, including but not limited to: (i) actual identity theft; (ii) the compromise, publication, and/or theft of their PII; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their PII; (iv) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from tax fraud and identity theft; (v) costs associated with placing freezes on credit reports; (vi) the continued risk to their PII, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII of its current and former employees and students in its continued possession; and (vii) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the PII compromised as a result of the Data Breach for the remainder of the lives of Plaintiffs and the Class.

171.    Additionally, as a direct and proximate result of Defendant's negligence *per se*, Plaintiffs and the Class have suffered and will suffer the continued risks of exposure of their PII,

which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII in its continued possession.

172.    As a direct and proximate result of Defendant's negligence *per se*, Plaintiffs and the Class are entitled to recover actual, consequential, and nominal damages.

**<u>COUNT III</u>**
**BREACH OF IMPLIED CONTRACT**
**(On Behalf of Plaintiffs and the Nationwide Class)**

173.    Plaintiffs and the Class re-allege and incorporate all foregoing paragraphs of this Complaint as if fully set forth herein.

174.    Defendant required Plaintiffs and Class Members to entrust it with their PII, including names, dates of birth, addresses, Social Security numbers, credit/debit card numbers, health insurance application/claims information, and health insurance policy numbers/subscriber numbers.

175.    As a condition of their employment or enrollment as a student with Defendant, Plaintiffs and Class Members entrusted their PII to Defendant. In so doing, Plaintiffs and the Class entered into implied contracts with Defendant by which Defendant agreed to safeguard and protect such information, to keep such information secure and confidential, and to timely and accurately notify Plaintiffs and the Class if their data had been breached, compromised, or stolen.

176.    In fact, Defendant promised in its privacy policy that it "will not share your [PII] with third parties" and claimed to be "firmly committed to data security".

177.    Plaintiffs and Class Members fully performed their obligations under the implied contracts with Defendant.

178.     Defendant breached the implied contracts they made with Plaintiffs and Class Members by failing to safeguard and protect their PII and by failing to provide timely and accurate notice to them that their PII was compromised in the Data Breach.

179.     As a direct and proximate result of Defendant's above-described breach of implied contract, Plaintiffs and Class Members have suffered (and will continue to suffer) ongoing, imminent, and impending threat of identity theft crimes, fraud, and abuse, resulting in monetary loss and economic harm; actual identity theft crimes, fraud, and abuse, resulting in monetary loss and economic harm; loss of the confidentiality of the stolen confidential data; the illegal sale of the compromised data on the dark web; expenses and/or time spent on credit monitoring and identity theft insurance; time spent scrutinizing bank statements, credit card statements, and credit reports; expenses and/or time spent initiating fraud alerts, decreased credit scores and ratings; lost work time; and other economic and non-economic harm.

180.     As a direct and proximate result of Defendant's above-described breach of implied contract, Plaintiffs and Class Members are entitled to and demand actual, consequential, and nominal damages.

**COUNT IV**
**UNJUST ENRICHMENT**
**(On Behalf of Plaintiffs and the Nationwide Class)**

181.     Plaintiffs and the Class re-allege and incorporate all foregoing paragraphs of this Complaint as if fully set forth herein.

182.     This Count is pleaded in the alternative to Plaintiffs' breach of implied contract claim.

183.     Plaintiff and Class Members conferred a monetary benefit on Defendant by providing Defendant with their valuable PII.

184.     Defendant enriched itself by saving the costs it reasonably should have expended on data security measures to secure Plaintiffs' and Class Members' PII.

185.     Instead of providing a reasonable level of security that would have prevented the Data Breach, Defendant instead calculated to avoid their data security obligations at the expense of Plaintiff and Class Members by utilizing cheaper, ineffective security measures. Plaintiff and Class Members, on the other hand, suffered as a direct and proximate result of Defendant's failure to provide the requisite security.

186.     Under the principles of equity and good conscience, Defendant should not be permitted to retain the money belonging to Plaintiff and Class Members because Defendant failed to implement appropriate data management and security measures that are mandated by industry standards.

187.     Defendant acquired the monetary benefit and PII through inequitable means in that it failed to disclose the inadequate security practices previously alleged.

188.     If Plaintiffs and Class Members knew that Defendant had not secured their PII, they would not have agreed to provide their PII to Defendant.

189.     As a direct and proximate result of Defendant's conduct, Plaintiffs and Class Members have suffered and will suffer injury, including but not limited to: (i) an increased risk of actual identity theft and fraud; (ii) the loss of the opportunity how their PII is used; (iii) the compromise, publication, and/or theft of their PII; (iv) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, and/or unauthorized use of their PII; (v) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft;

(vi) the continued risk to their PII, which remain in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect PII in its continued possession; and (vii) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the PII compromised as a result of the Data Breach for the remainder of the lives of Plaintiff and Class Members.

190.    As a direct and proximate result of Defendant's conduct, Plaintiffs and the Class have suffered and will continue to suffer other forms of injury and/or harm.

191.    Defendant should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiffs and the Class, proceeds that they unjustly received from them.

## COUNT V
### VIOLATION OF NEW YORK DECEPTIVE TRADE PRACTICES ACT
### NEW YORK GENERAL BUSINESS LAW ("GBL") § 349
### (On Behalf of Plaintiffs Kobor, Cogan, and the New York Subclass)

192.    Plaintiffs Kobor, Cogan, and the New York Subclass re-allege and incorporate all foregoing paragraphs of this Complaint as if fully set forth herein.

193.    New York Deceptive Trade Practices Act, N.Y. Gen. Bus. Law § 349, prohibits deceptive acts or practices in the conduct of any business, trade, or commerce, or in the furnishing of any service in the state of New York.

194.    By reason of the conduct alleged herein, Defendant engaged in unlawful practices within the meaning of the N.Y. Gen. Bus. Law § 349. The conduct alleged herein is a "business practice" within the meaning of the N.Y. Gen. Bus. Law § 349, and the deception occurred within New York State.

195.    Defendant stored Plaintiffs' and New York Subclass Members' PII in Defendant's electronic databases. Defendant knew or should have known it did not employ reasonable, industry

standard, and appropriate security measures that complied with all relevant regulations and would have kept Plaintiffs' and New York Subclass Members' PII secure and prevented the loss or misuse of that PII. Defendant did not disclose to Plaintiffs and New York Subclass Members that its data systems were not secure.

196.    Plaintiffs and New York Subclass Members would not have provided Defendant with their PII if they had been told or knew that Defendant failed to maintain sufficient security thereof, and its inability to safely store Plaintiffs' and New York Subclass Members' PII.

197.    As alleged herein in this Complaint, Defendant engaged in the unfair or deceptive acts or practices in the conduct of consumer transactions in violation of N.Y. Gen. Bus. Law § 349, including but not limited to:

i.    Representing that their services were of a particular standard or quality that it knew or should have known were of another;

ii.    Failing to implement and maintain reasonable security and privacy measures to protect Plaintiffs' and New York Subclass Members' PII, which was a direct and proximate cause of the Data Breach;

iii.    Failing to identify foreseeable security and privacy risks, and remediate identified security and privacy risks, which was a direct and proximate cause of the Data Breach;

iv.    Failing to comply with common law and statutory duties pertaining to the security and privacy of Plaintiffs' and New York Subclass Members' PII, including duties imposed by the FTCA, 15 U.S.C. § 45, which was a direct and proximate cause of the Data Breach;

v.    Misrepresenting that they would protect the privacy and confidentiality of Plaintiffs' and New York Subclass Members' PII, including by implementing and maintaining reasonable security measures;

vi.    Omitting, suppressing, and concealing the material fact that it did not reasonably or adequately secure Plaintiffs' and New York Subclass Members' PII; and

vii.    Omitting, suppressing, and concealing the material fact that it did not comply with common law and statutory duties pertaining to the security and privacy of Plaintiffs' and New York Subclass Members' PII, including duties imposed by the FTCA, 15 U.S.C. § 45, which was a direct and proximate result of the Data Breach.

198.    Defendant's representations and omissions were material because they were likely to deceive reasonable consumers about the adequacy of Defendant's data security and ability to protect the confidentiality of Plaintiffs' and New York Subclass Members' PII.

199.    Specifically, in Defendant's Privacy Policy, Defendant promises it "will not share your [PII] with third parties…", and also falsely claims it "is firmly committed to data security."

200.    Such misrepresentations by Defendant are and were deceptive acts or practices which are and/or were likely to mislead a reasonable person providing his or her PII to Defendant. These deceptive acts and practices are material. The requests for and use of such PII in New York through deceptive means occurring in New York were consumer-oriented acts and thereby fall under the New York consumer fraud statute, N.Y. Gen. Bus. Law § 349.

201.    In addition, Defendant's failure to secure students' and employees' PII violated the FTCA and therefore violated N.Y. Gen. Bus. Law § 349.

202.    Defendant knew or should have known that its computer systems and data security practices were inadequate to safeguard the PII of Plaintiffs and New York Subclass Members, deter hackers, and detect a breach within a reasonable time, and that the risk of a data breach was highly likely. Plaintiffs and New York Subclass Members accordingly seek all monetary and non-monetary relief allowed by law, including actual damages, injunctive relief, civil penalties, and attorneys' fees and costs.

203.    The aforesaid conduct violated N.Y. Gen. Bus. Law § 349, in that it is a restraint on trade or commerce.

204.    Defendant's violations of N.Y. Gen. Bus. Law § 349 has an impact and is of general importance to the public, including the people of New York. Thousands of New Yorkers have had

their PII stored on Defendant's electronic database, many of whom have been impacted by the Data Breach.

205.    As a direct and proximate result of these deceptive trade practices, Plaintiffs and New York Subclass Members are entitled to judgment under N.Y. Gen. Bus. Law § 349, to enjoin further violations, to recover actual damages, to recover the costs of this action (including reasonable attorneys' fees), and such other relief as the Court deems just and proper.

206.    On information and belief, Defendant formulated and conceived of the systems used to compile and maintain current and former student and employee information largely within the state of New York, oversaw its data privacy program complained of herein from New York, and its communications and other efforts to hold data largely emanated from New York.

207.    Most, if not all, of the alleged misrepresentations and omissions by Defendant that led to inadequate measures to protect Plaintiffs' and New York Subclass Members' information occurred within or were approved within New York.

208.    Defendant's implied and express representations that it would adequately safeguard Plaintiffs' and New York Subclass Members' PII constitute representations as to the particular standard, quality, or grade of services that such services did not actually have (as the services were of another, inferior quality), in violation of N.Y. Gen. Bus. Law § 349.

209.    Accordingly, Plaintiffs, on behalf of themselves and New York Subclass Members, bring this action under N.Y. Gen. Bus. Law § 349 to seek such injunctive relief necessary to enjoin further violations and recover costs of this action, including reasonable attorneys' fees and other costs.

<u>COUNT VI</u>
**DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF**
**(On Behalf of Plaintiffs and the Nationwide Class)**

210.    Plaintiffs and the Class re-allege and incorporate all foregoing paragraphs of this Complaint as if fully set forth herein.

211.    Plaintiffs pursue this claim under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201.

212.    Defendant owes a duty of care to Plaintiffs and the Class that requires it to adequately secure Plaintiffs' and the Class's PII.

213.    Defendant failed to fulfill their duty of care to safeguard Plaintiffs' and the Class's PII.

214.    Plaintiffs and the Class are at risk of harm due to the compromise of their PII and Defendant's failure to address the security failings that lead to such exposure.

215.    Plaintiffs, therefore, seek a declaration that (1) Defendant's existing security measures do not comply with their explicit or implicit contractual obligations and duties of care to provide reasonable security procedures and practices appropriate to the nature of the information to protect Plaintiffs' and Class Members' PII, and (2) to comply with their explicit or implicit contractual obligations and duties of care, Defendant must implement and maintain reasonable security measures, including, but not limited to:

      a.    Engaging third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendant's systems on a periodic basis, and ordering Defendant to promptly correct any problems or issues detected by such third-party security auditors;

      b.    Engaging third-party security auditors and internal personnel to run automated security monitoring;

      c.    Auditing, testing, and training its security personnel regarding any new or modified procedures;

d.      Segmenting its user applications by, among other things, creating firewalls and access controls so that if one area is compromised, hackers cannot gain access to other portions of Defendant's systems;

e.      Conducting regular database scanning and security checks;

f.      Routinely and continually conducting internal training and education to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach;

g.      Purchasing credit monitoring services for Plaintiffs and the Class for a period of ten years; and

h.      Meaningfully educating Plaintiffs and the Class about the threats they face as a result of the loss of their PII to third parties, as well as the steps they must take to protect themselves.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, request judgment against Defendant and that the Court grant the following:

1.      For an order certifying the Class and appointing Plaintiffs and their counsel to represent the Class;

2.      For an order enjoining Defendant from engaging in the wrongful conduct alleged herein concerning disclosure and inadequate protection of the PII belonging to Plaintiffs and the Class;

3.      For injunctive relief requiring Defendant to:

a.      Engage third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendant's systems on a periodic basis, and ordering Defendant to promptly correct any problems or issues detected by such third-party security auditors;

b.      Engage third-party security auditors and internal personnel to run automated security monitoring;

c.      Audit, test, and train its security personnel regarding any new or modified procedures;

d.      Segment their user applications by, among other things, creating firewalls and access controls so that if one area is compromised, hackers cannot gain access to other portions of Defendant's systems;

e.      Conduct regular database scanning and security checks;

f.      Routinely and continually conduct internal training and education to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach;

g.      Purchase credit monitoring services for Plaintiffs and the Class for a period of ten years; and

h.      Meaningfully educate Plaintiffs and the Class about the threats they face as a result of the loss of their PII to third parties, as well as the steps they must take to protect themselves.

4.    An order instructing Defendant to purchase or provide funds for credit monitoring services for Plaintiffs and all Class Members;

5.    An award of compensatory, statutory, nominal and punitive damages, in an amount to be determined at trial;

6.    An award for equitable relief requiring restitution and disgorgement of the revenues wrongfully retained as a result of Defendant's wrongful conduct;

7.    An award of reasonable attorneys' fees, costs, and litigation expenses, as allowable

by law; and

8.    Any and all such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand this matter be tried before a jury.

-Respectfully submitted,

Dated: January 29, 2024

/s/ *John J. Nelson*
John J. Nelson ((admitted *pro hac vice*)
**MILBERG COLEMAN BRYSON**
**PHILLIPS GROSSMAN, PLLC**
402 W. Broadway, Suite 1760
San Diego, CA 92101
Telephone: (858) 209-6941
jnelson@milberg.com

*Interim Liaison Counsel*

Philip J. Krzeski (admitted *pro hac vice*)
**CHESTNUT CAMBRONNE PA**
100 Washington Avenue South, Suite 1700
Minneapolis, MN 55401
Telephone: (612) 339-7300
Facsimile: (612)-336-2940
pkrzeski@chestnutcambronne.com

William B. Federman (admitted *pro hac vice*)
**FEDERMAN & SHERWOOD**
10205 North Pennsylvania Avenue
Oklahoma City, OK 73120
Telephone: (405) 235-1560
212 W. Spring Valley Road
Richardson, TX  75081
wbf@federmanlaw.com

*Interim Co-Lead Class Counsel*

Randi Kassan
**MILBERG COLEMAN BRYSON**
**PHILLIPS GROSSMAN, PLLC**
100 Garden City Plaza
Garden City, NY 11530
Telephone: (212) 594-5300
rkassan@milberg.com

*Attorneys for Plaintiffs and Putative Class*

*\*Admitted Pro Hac Vice*